UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

No. 6:23-cv-00134

**Tyler Regional Hospital, LLC dba UT Health Tyler et al.,**
*Plaintiffs,*
v.
**Department of Health and Human Services et al.,**
*Defendants.*

**OPINION AND ORDER**

 This lawsuit presents a single merits question: in administering a program to dispense COVID-19 relief funds, did an agency act arbitrarily, capriciously, in an abuse of its discretion, or contrary to law by refusing to allow plaintiffs to correct a single-digit typographical error discovered after the deadline to apply for funds, where plaintiffs received ambiguous communication about whether the agency had verified that part of the application before the deadline? *See* 5 U.S.C. § 706(2)(A).

 Plaintiffs move for (1) summary judgment awarding declaratory relief, a permanent injunction, and an order setting aside agency action, and (2) a preliminary injunction controlling until the issuance of a final judgment. Doc. 15. The court ordered expedited briefing and held a hearing on the motion. Doc. 16. It was unnecessary to issue a Rule 65(a)(2) order consolidating merits proceedings with a hearing on preliminary relief because plaintiffs' motion itself consolidated them, seeking both interim and final relief. Doc. 15 at 6, 23. Nonetheless, to provide abundant notice, the court confirmed that the hearing on plaintiffs' motion would concern both interim and final relief. Doc. 21. The court now grants the motion for summary judgment in part.

1. **Procedural posture**

 One form of relief sought by plaintiffs, an order directing the agency to pay a fixed sum of money to plaintiffs, with interest, is barred by the government's sovereign immunity from damages.

*See* Doc. 1 at 12 ¶ 4. The claim for that relief is dismissed as beyond the court's subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

That dismissal removes from the case the only issue on which defendants requested more time to present facts or conduct discovery to oppose summary judgment. *See* Fed. R. Civ. P. 56(d). Defendants stated that, apart from evidence on the dollar figure that should be awarded if plaintiffs' typographical error was corrected—a calculation now dismissed from the case—they had not identified any "items of evidence that [defendants] would like to develop that [defendants] believe would bear on the issues of arbitrariness, capriciousness, abuse of discretion, or accordance with law." Hr'g Tr. at 15:11:30. The court appreciates the diligence with which the parties briefed and presented evidence on the motion for summary judgment, including plaintiffs' 111 pages and defendants' 299 pages of exhibits, allowing the court to rely on those "parts of [the administrative record] cited by [each] party." 5 U.S.C. § 706(2). Based on the undisputed facts noted below, the court holds that plaintiffs are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

**2. Legal background and undisputed facts**

On March 11, 2021, the President signed into law the American Rescue Plan Act of 2021, Pub. L. 117-2, 135 Stat. 4. The Act included various measures to assist with economic recovery as the Nation continued to deal with the effects of the COVID-19 pandemic. Among other various measures, the Act appropriated $8.5 billion "for purposes of making payments to eligible health care providers for health care related expenses and lost revenues that are attributable to COVID-19." *Id.*, § 9911, 135 Stat. at 236 (codified at 42 U.S.C. § 1320b-26(a)). The Act imposes payment-eligibility criteria of both form and substance:

> To be eligible for a payment under this section, an eligible health care provider shall submit to the Secretary an application in such form and manner as the Secretary shall prescribe. Such application shall contain the following:

> (1) A statement justifying the need of the provider for the payment, including documentation of the health care related expenses attributable to COVID-19 and lost revenues attributable to COVID-19.
>
> *(2) The tax identification number of the provider.*
>
> (3) Such assurances as the Secretary determines appropriate that the eligible health care provider will maintain and make available such documentation and submit such reports (at such time, in such form, and containing such information as the Secretary shall prescribe) as the Secretary determines is necessary to ensure compliance with any conditions imposed by the Secretary under this section.
>
> (4) Any other information determined appropriate by the Secretary.

42 U.S.C. § 1320b-26(b) (emphasis added). This lawsuit challenges the agency's policy on accepting revisions to a provider's tax-identification number ("TIN") after the application deadline.

To be an eligible health care provider (a defined term), a provider must be a "rural provider or supplier." *Id.* § 1320b-26(e)(1). Thus, funding under this program is often referred to as "ARP Rural" to distinguish it from other sources of COVID-19 relief funding. One such source of other funds is the "Provider Relief Fund," or "PRF." The PRF was established in the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281, to reimburse health care providers for increased expenses or lost revenue attributable to COVID-19. PRF funds were distributed in four General Distribution phases, as well as through Targeted Distributions. The Phase 4 distribution provided $17 billion, and applications for those funds shared the same deadline as applications for ARP Rural funds.

Both funding programs are administered by the Health Resources and Services Administration ("HRSA"), an agency within the Department of Health and Human Services. Because applicants for PRF Phase 4 funds could also be considered for

ARP Rural funds, HRSA developed an electronic portal, "Portal 4.0," to collect applications for both funding opportunities. *See* Doc. 19-1 at 6. Applications could be submitted using Portal 4.0 beginning on September 29, 2021. *Id.*

To define the application process, HRSA created and published online application instructions, methodologies, and FAQ answers, which are reproduced in the record here. *See* Doc. 19-2 at 11–109 (pinpoint citations use ECF page number). The instructions inform applicants that, although ARP funding is issued to the filing organization, the calculation of the funding amount turns on a formula that considers medical services billed by all subsidiaries, so the filing organization must list all subsidiaries' taxpayer-identification numbers (TINs) to allow full payment.

For instance, the application instructions state: "HRSA will calculate the ARP Rural and a portion of Phase 4 payments based on the submitted billing TINs. Failure to include an exhaustive list of billing TINs that provide patient care will affect the amount of the applicant's ARP Rural payment and Phase 4 bonus payment." Doc. 19-2 at 19 (Ex. C). This instruction puts a filer on notice that HRSA needs a subsidiary's TIN to allow the medical services billed by that subsidiary to count towards the payment made to the filing organization. In other words, as the statute says, the application must contain a provider's TIN. But that instruction does not directly say anything about the agency's approach to amending an application to fix a typo in a TIN.

If a parent organization applied on behalf of multiple subsidiaries for funding, it was instructed to submit supporting financial information for each subsidiary. Applicants were told that the agency would only consider for funding eligibility the TINs entered in the electronic application portal. Doc. 19-2 at 27.

Applicants were given ambiguous information about how the agency would screen those TINs before an application through the portal was complete. The FAQ answers issued by the agency state that an ARP Rural application has two steps, with an initial deadline to "complete the first step of the application process no

later than October 26, 2021," which "involved submitting a TIN for validation and may take a few days." Doc. 19-2 at 94. The second deadline, for a complete application, was November 3, 2021. Doc. 19-1 at 6. So applicants were told that step one of the application process involved TIN validation by the agency.

The agency's published methodology for determining the ARP Rural payments then explains that step one's TIN validation itself has two parts, with the first part including the validation of multiple TINs for a single provider:

> **Step 1: TIN Validation.**
>
> **IRS Validation:** Once a provider applies for a Phase 4/ARP Rural Distribution payment, *the provider's Tax Identification Numbers (TINs) are validated against the Internal Revenue Service (IRS) data* in order to ensure that the TIN submitted is a valid, registered TIN and is associated with the correct name on the provider's tax return. The most common reason that providers fail IRS validation is that their application does not list their tax name exactly as it appears on their W-9. Entities that do not pass the IRS validation are deemed ineligible for an ARP Rural payment.
>
> **TIN Validation:** Once a provider passes IRS validation, HRSA will verify that the entity is a known provider as a part of program oversight. HRSA has compiled a list of 1.4 million TINs associated with valid Medicare, Medicaid, Children's Health Insurance Program (CHIP), dental, behavioral health, and other eligible providers (i.e., curated list of providers). If a Medicare, Medicaid, or CHIP provider is on the curated list, the applicant is eligible to apply via the PRF application portal for ARP Rural payments.

Doc. 19-2 at 15–16 (emphasis added). The methodology goes on to explain that the agency will check for different types of duplicate TINs and then go on to calculate a payment amount for the filing TIN by calculating the number and type of claims for each billing TIN. *Id.* at 16.

The quoted portion of that methodology is ambiguous about precisely which TINs will be validated against the IRS records. One part of the methodology says that "the TIN submitted," singular, will be validated. But, immediately before that clause, the same sentence uses the plural verb "are" to speak of validating multiple TINs for a single provider: "the provider's Tax Identification Numbers (TINs) are validated." *Id.* at 15.

The filing instructions do warn that noncompliance "may"—not "will"—result in application rejection. "Failure to adhere to these requirements and the following instructions may result in HRSA deeming your application ineligible for payment." Doc. 19-2 at 20. The instructions do not rise to the level of the warning contemplated in *Salzer v. FCC*, "explicit notice" of a "letter-perfect" standard. 778 F.2d 869, 873 (D.C. Cir. 1985).

The PRF Phase 4 instructions on complex financial situations state that, although funding applications must include all subsidiaries that provide patient care, "HRSA will review exceptions on a case-by-case basis." Doc. 19-2 at 97. This allowance for case-by-case consideration of exceptions confirms that the agency's publications did not give explicit notice of a letter-perfect standard.

The agency's published methodology states that, once TIN validation is satisfied, an applicant "is eligible to apply via the PRF application portal for ARP Rural payments." Doc. 19-2 at 167. An applicant is instructed to then enter supporting information and documentation via the portal and submit the application. *Id.* at 19–31.

This case concerns an ARP Rural funding application submitted by a health system on behalf of ten subsidiary hospitals. The specific hospital at issue is plaintiff Tyler Regional Hospital, LLC, which does business as UT Health Tyler. It is an acute-care hospital in Tyler, Texas, serving a substantial rural population. Plaintiff East Texas Health System, LLC, a component of Ardent Health Services, is the controlling affiliate of a group of hospitals that includes UT Health Tyler. Doc. 1 at 4; Doc. 15-2 at 1.

The agency and UT Health Tyler have had dealings since at least November 2017, as UT Health Tyler has participated in and received payments issued by HRSA from Medicare programs, all using the hospital's Taxpayer Identification Number, 82-3878395. Doc. 15-2 at 2. Thus, HRSA staff could have determined the correct TIN for UT Health Tyler with an internal inquiry if the TIN provided for it in the application here did not validate.

On October 23, 2021, East Texas Health System used Portal 4.0 to apply for PRF Phase 4 and ARP Rural funds on behalf of the Health System's ten subsidiary hospitals. Docs. 15-2 at 3; 15-3. Using that portal, the Health System entered its own TIN as the "Organization TIN." Doc. 15-3 at 69; *see* Doc. 15-2 at 3; Doc. 19 at 6. It then entered a TIN for each of the subsidiary hospitals. For UT Health Tyler, the Health System entered a TIN ending "5395" instead of "8395" but otherwise correct. Doc. 19-2 at 171 (Ex. G) (entry for row labeled AllTINSIncludedInFilingTIN).

The Health System then moved on in the portal and selected "Validate TIN" for its application. *See* Doc. 15-2 at 3; Doc. 19-2 at 131, 140. It is now undisputed, however, that "[t]he IRS validation step did not verify the billing TINs of subsidiaries." Doc. 19-1 at 6. And it is now undisputed that this IRS validation step in Portal 4.0 was the same as to the Health System's application for both ARP Rural and PRF Phase 4 funding. As noted, however, the agency's *notice* about the process was ambiguous on whether TIN verification would occur for subsidiaries or for one TIN only.

After several days, the portal displayed a green check mark next to the "Validate TIN" field for plaintiffs' application. Doc. 15-2 at 3. A screenshot showing an example of that green check mark is provided in training materials filed by the agency. Doc. 19-2 at 132. After receiving that notice of TIN verification, the Health System uploaded financial information and other documentation about UT Health Tyler and the nine other system hospitals. Doc. 15-2 at 3. In that supporting documentation, the Health System gives for UT Health Tyler the same mistyped TIN ending "5395" instead of "8395." Doc. 15-3 (Ex. B) at 68 (twice),

69 (twice). In a fifth instance, the supporting documentation gives a TIN ending "8396" instead of "8395." *Id.* at 66. At the motion hearing, defendants confirmed that, apart from the application's failure to give a correctly typed TIN for that hospital, the application met the statutory criteria in 42 U.S.C. § 1320b-26(b) for UT Health Tyler's affected business to be included in the calculation for an ARP Rural relief payment.

After the November 3 application deadline, HRSA moved to distribute ARP Rural funds. Doc. 19-1 at 10. The Health System signed up for a payment delivery program in March 2022, and later that month the agency issued an ARP Rural payment to the Health System. *Id.* at 11. Because the mistyped TIN provided for UT Health Tyler had no eligible Medicare, Medicaid, or CHIP claims for rural beneficiaries, the ARP Rural payment included no money for that hospital. *Id.* at 10–12. The agency accompanied the payment with a letter stating that the Health System was required to distribute the payment to its subsidiary hospitals in specified dollar amounts, listed by subsidiary TIN. *Id.* at 11–12. The letter did not show a dollar amount or a payment for UT Health Tyler, explaining that TINs would not be listed if (1) they did not have eligible Medicare, Medicaid, or CHIP payments or (2) they were on an exclusion list. *Id.* at 12.

In response, the Health System contacted the agency about why UT Health Tyler was not included in the ARP Rural payment. The agency responded that "the TIN ending in *****5395 is not receiving an ARP Payment based on the ARP Payment Methodology." Doc. 15-5 at 1. In May 2022, the Health System then submitted to the agency a request for reconsideration of its calculation of the ARP Rural payment. Doc. 15-6. The Health System noted that "HRSA has not issued an ARP Rural payment to UT Health Tyler (TIN 823875395), an acute care hospital included in East Texas Health System's consolidated tax return." *Id.* at 5.

On June 16, the agency responded, "According to our records, there are no Medicare, Medicaid, or the Children's Health

Insurance Program claims associated with TIN *5395 for UT Health Tyler." Doc. 15-8 at 2. The agency noticed, however, that the Health System's supporting documents included different TINs for UT Health Tyler: "Additionally, in reviewing the tax records included with East Texas Health System, LLC's application . . . it is unclear as to the correct TIN for UT Health Tyler. On page 70 . . . , the TIN listed for UT Health Tyler is *8396, and on page 72. . . listed UT Health Tyler's Employee Identification Number as *5395." *Id.* The agency explained that ARP Rural payments are calculated using the TIN provided for each subsidiary provider and that providers "are not able to change any previously submitted information, including the TINs listed." *Id.* at 2–3.

On July 27, 2022, plaintiffs responded to the agency. They conceded that their application inadvertently listed UT Health Tyler's TIN as ending either "5395" or "8396" and provided the correct TIN ending "8395." Doc. 15-9 at 1. Plaintiffs asserted that their provision of an incorrect TIN "should not prevent HRSA from processing an ARP Rural Payment" and asked to "correct a clerical error so that HRSA can process payment." *Id.* at 1, 2.

On August 11, 2022, the agency rejected plaintiffs' request to correct their application, giving one reason: "in order to ensure equitable and consistent treatment of all providers, HRSA cannot permit providers to revise their applications after they are submitted." Doc. 15-10 at 2. The agency noted that a provider can request reconsideration of its application but that reconsideration does not allow changing previously submitted information. *Id.*

On August 18, 2022, plaintiffs wrote to the general counsel of HHS, asking the agency to issue ARP Rural funding outside of the reconsideration process, while noting that plaintiffs had submitted a reconsideration request. Doc. 15-11 at 1–2. On September 8, 2022, the general counsel responded without addressing the substance of plaintiffs' letter, instead merely updating plaintiffs that the reconsideration request was pending. Doc. 15-12 at 2. That reconsideration request remains pending with the agency. On March 16, 2023, plaintiffs filed this lawsuit.

### 3. Plaintiffs' entitlement to judgment as a matter of law

As a preliminary matter, defendants object that this dispute is not ripe. Doc. 19 at 13. But the agency's calculation of an ARP Rural payment that did not include funds for UT Health Tyler was formalized in the March 2022 letter accompanying that payment, and its effects have been felt in a concrete way—the lack of funds. *Cf. Nat'l Park Hosp. Ass'n v. DOI*, 538 U.S. 803, 807–08 (2003). The agency has made clear that it is not reconsidering that position and adheres to its policy that corrections will not be allowed. Doc. 19 at 21–22; *see Edwards v. Johnson*, 209 F.3d 772, 777 (5th Cir. 2000); *see also Randolph–Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986) (futility exception to exhaustion doctrine). Defendants' application of their policy to plaintiffs is thus ripe for judicial review.

As to the merits, an agency action must be upheld against a claim of abuse of discretion, arbitrariness, and capriciousness if the agency considered all of the relevant factors and articulated a rational connection between the factors and the agency action. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974); *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433–434 (5th Cir. 2021). An agency decision "would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Sierra Club v. EPA*, 939 F.3d 649, 663-64 (5th Cir. 2019). Agencies must act "within a zone of reasonableness and, in particular, [] reasonably consider[] the relevant issues and reasonably explain[] the decision." *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 855 (5th Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)). Courts, in turn, "must set aside any action premised on reasoning that fails to account for 'relevant factors'

or evinces 'a clear error of judgment.'" *Data Mktg. P'ship*, 45 F.4th at 855 (quoting *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (internal quotation marks omitted)).

At the outset, the court must precisely identify the challenged agency action. In March 2022, the agency issued an ARP Rural payment to the Health System along with a letter naming the subsidiary hospitals entitled to those funds. That decision itself was not an abuse of discretion, arbitrary, capricious, or contrary to law. The agency properly relied on each provider's TIN stated in the Health System's application for funds.

In July 2022, however, the Health System discovered the typo and requested that the agency amend its application to correct the TIN for UT Health Tyler. The agency denied that request on August 11, 2022. That refusal to allow a correction is now challenged by plaintiffs.

Persuasive D.C. Circuit precedent is available to guide judicial review of an agency decision not to allow correction of a typo. *Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329 (D.C. Cir. 2004). There, a broadcaster made a single-digit typographical error in stating the geographic coordinates of its transmitter station. *Id.* at 1331. After the error was discovered, the FCC cancelled the license by deeming it void *ab initio* since the coordinates provided were not for a valid site but rather a spot in the ocean. *Id.* at 1333. The FCC rejected the broadcaster's request to correct the typo, reasoning that the "burden is on the applicant to provide accurate site information in its application." *Id.* (The FCC also reasoned that the application would not have been granted, even if it contained the correct location, because of radio interference. *Id.* In contrast, here, UT Health Tyler undisputedly would be entitled to ARP Rural funds if its application had the correct TIN.)

The D.C. Circuit held that the agency's "void *ab initio*" policy as applied to the broadcaster failed APA reasonableness review under § 706(2)(A) for three reasons: (1) it was an unexplained change from past agency practice, (2) the agency had not given

explicit notice that an applicant would bear the full cost of any mistake, and (3) the agency could determine the precise location of the broadcaster's operation with minimal effort. *Id.* Here, for purposes of summary judgment, plaintiffs rely on the second and third rationale.

That reliance is well-placed. HRSA's publications gave only ambiguous notice about whether the agency itself was verifying all TINs entered in the portal at step one of the application process and, thus, about who was bearing responsibility for a mistake in proceeding with an application after the agency's TIN verification completed successfully. The agency's published methodology spoke of the agency validating multiple TINs for a single provider. *See supra* pp. 5–6. The agency also said that TIN validation was performed for a "provider," Doc. 19-2 at 95, and only UT Health Tyler among the two plaintiffs is a hospital. Doc. 15-2 at 1; *see* 42 U.S.C. § 1395x(d), (u) (defining "provider of services" and "supplier" for purposes of the Act's definition of "eligible health care provider," 42 U.S.C. § 1320b-26(e)). Moreover, in the application portal, the Health System was allowed to and did in fact enter a TIN for each of the subsidiary hospitals before submitting the application for TIN validation. *See supra* p. 7.

It is undisputed that the agency did not, in fact, validate the TIN of a subsidiary, billing provider entered in the application portal. But the agency's publications did not clearly and unambiguously announce that practice. And, given the circumstances just noted, plaintiffs were not reasonably on notice that the agency's TIN validation was so limited.

Plaintiffs thus reasonably understood the green check mark that appeared in the portal next to "Validate TIN," after plaintiffs entered a TIN for each provider in the East Texas Health System, as giving them the green light to proceed with the TIN data entered. That conclusion triggers the D.C. Circuit's reasoning that fair notice must be provided before an error is held strictly against a party. *Commc'ns & Control, Inc.*, 374 F.3d at 1336. The Fifth Circuit has reached the same conclusion about fair notice after an

agency indicates approval of a party's action: "Where a company has been informed by an OSHA inspector that its procedures or processes are safe and satisfactory, the company has a valid fair notice complaint if cited for the same procedures in a later inspection." *Trinity Marine Nashville, Inc. v. Occupational Safety & Health Rev. Comm'n*, 275 F.3d 423, 430 (5th Cir. 2001).

Plaintiffs' fair-notice complaint thus has merit. Yet HRSA, in denying plaintiffs' request to correct the typo, did not discuss the agency's own ambiguous publications or the functioning of its portal system. That failed to consider an important aspect of the request before it and was a clear error of judgment. *Data Mktg. P'ship*, 45 F.4th at 855.

In addition to fair notice, *Communications and Controls* also reviewed the impact on agency functioning of allowing a party to correct a clerical error. 374 F.3d at 1336. Just as the FCC in that case could have determined the transmitter's precise location with minimal effort, HRSA in this case could have verified the correct TIN with minimal effort. For years, the agency had dealings with UT Health Tyler using its correct TIN. Doc. 15-2 at 2. And the agency already had in place a system for verifying providers' TINs as a program-integrity measure in administering ARP Rural relief funds. Doc. 19-2 at 94–95.

The agency does argue that it had a strong need to rely on the TINs entered in the application portal as being perfect from the outset, to allow prompt and efficient issuance of relief funds. But that assertion is weakened by the agency's own choice in designing its application portal, which verified only the parent organization's TIN and not subsidiary providers' TINs.

That justification is further undercut by how the ARP Rural funds have been distributed so far. The agency relies on a need to understand the number of eligible health care providers and size of their potential payments early enough to fairly divide limited funds among all applicants. Doc. 19 at 22. That is one program-administration need, but it is not the only one. The agency did not simply distribute all of the appropriated money at the outset.

Rather, some money—around $192 million at this point—has been held back and remains available for payments as pending agency reconsideration proceedings are resolved. Doc. 19-1 at 23–24. It is impossible to know whether those remaining funds will be depleted before all claimants deemed worthy on reconsideration can be paid.

That practice shows that the administrators of ARP Rural recognized, not a mere interest in a final apportionment of funds before any payments issued, but a complementary interest in allowing some funds to issue after errors are corrected. That undermines the suggestion that fair apportionment of ARP Rural funds could not be performed if entitlement amounts could be revised after the initial payments issued. And the suggestion that program administration could not tolerate any case-by-case judgments is undermined by the agency's statement, as to a requirement about application TINs, that the agency would "review exceptions on a case-by-case basis." Doc. 19-2 at 97.

The court does not hold that all providers must be allowed to revise or correct their applications. *Contra* Doc. 19-1 at 24. The court's reasoning extends only to providers in plaintiffs' situation, who did not have fair notice that the agency had not verified all TINs entered into Portal 4.0 despite receiving a message that TIN verification was complete, thus allowing the providers to proceed to step two of their applications.

Lastly, in emphasizing that the Act requires an application to include the provider's TIN, defendants confuse that undisputed statutory requirement with the question of when an agency must permit correction of clerical errors. If plaintiffs' application is amended to include the correct TIN, that statutory requirement for funding will be met. And nothing in the Act addresses or prohibits amendments to fix clerical errors.

For those reasons, defendants' August 11, 2022 refusal to allow the Health System to amend its application is arbitrary, capricious, an abuse of discretion—"politely speaking, unreasonable." *Comm'cns & Ctrl.*, 374 F.3d at 1336. And the unreasonableness of

that refusal means that the agency's delay in not deciding plaintiffs' request to reconsider the funding amount on that basis is unreasonable. *See* 5 U.S.C. § 706(1). As such, plaintiffs are entitled to judgment as a matter of law on their APA claim.

The court finds it proper to enter a final judgment declaring unlawful the August 11, 2022 agency action and setting it aside. *Id.* § 706(2)(A); 28 U.S.C. § 2201. The final judgment also enjoin the defendants (1) not to enforce their August 11, 2022 refusal of application amendment, and to thus amend plaintiffs' application to correct the mistyped TIN for UT Health Tyler, and (2) to process reconsideration of plaintiffs' application, as amended, within 10 calendar days of the date of the judgment. *See* 5 U.S.C. § 702; Fed. R. Civ. P. 65(d)(2).

### 4. Conclusion

For the reasons given above, plaintiffs' motion for summary judgment (Doc. 15) is granted. A final judgment will issue forthwith.

*So ordered by the court on May 17, 2023.*

J. CAMPBELL BARKER
United States District Judge